## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

SYLVIA GONZALEZ,

     *Plaintiff,*

v.

CITY OF CASTLE HILLS, TEXAS;

EDWARD "JR" TREVINO, II,
Mayor of Castle Hills, sued in his
individual capacity;

JOHN SIEMENS, Chief of the
Castle Hills Police Department,
sued in his individual capacity; and

ALEXANDER WRIGHT, sued in
his individual capacity,

     *Defendants.*

Civil Action No. 5:20-cv-1151

**Complaint and Jury Demand**

## COMPLAINT FOR RETROSPECTIVE RELIEF

Plaintiff Sylvia Gonzalez hereby sues the City of Castle Hills, Texas ("Castle Hills" or "City"); and Edward "JR" Trevino, II, John Siemens, and Alexander Wright (collectively, "Individual  Defendants") for their deprivation of her rights under the First and Fourteenth Amendments to the United States Constitution.

### Introduction

1.    After being elected to the Castle Hills city council, Sylvia Gonzalez participated in organizing a nonbinding citizens' petition to urge the removal of Ryan Rapelye from his position as the Castle Hills city manager.

2.     Getting wind of Sylvia's efforts and assuming she was the driving force behind the petition, Defendant Castle Hills and the Individual Defendants (collectively, "Defendants") adopted a plan to retaliate against Sylvia for her protected speech, resulting in Sylvia's arrest on manufactured misdemeanor charges of tampering with a government record.

3.     This lawsuit seeks redress for that unconstitutional arrest.

4.     Defendants charged Sylvia under a statute that has never before or since been used to arrest individuals similarly situated to Sylvia.

5.     Sylvia's arrest was unlawful because it was engineered and executed as part of a high-level policy to retaliate against Sylvia's exercise of political speech.

6.     This was a long-term and pervasive policy and involved significant deliberations—outside of split-second decision making—by high-level officials.

7.     Defendants succeeded in their attempts to punish and intimidate Sylvia, who, at the age of 72, made history as the City's first Hispanic councilwoman.

8.     Sylvia, with her reputation ruined and her pocketbook significantly diminished, has been so traumatized by the experience that she will never again help organize a petition or participate in any other public expression of her political speech. She will also never again run for any political office.

9.     There is nothing more fundamental to our system of government than its founding principle that the First Amendment protects political speech. This principle means little if local governments and their officials can—without consequence—punish and intimidate those who engage in political speech.  This suit

is filed in defense of this principle and to ensure the constitutional accountability of all government officials.

## Jurisdiction and Venue

10.     This is a civil rights case brought under 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the United States Constitution.

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

12.     Venue is proper in this Court under 28 U.S.C. § 1391.

## The Parties

13.     Plaintiff Sylvia Gonzalez is a citizen of the United States and long-time resident of Castle Hills, Texas.

14.     Defendant City of Castle Hills, Texas, is a Type A general-law municipality located in Bexar County, Texas. The City's governing body consists of a mayor and five aldermen, commonly referred to as councilmembers. The City has adopted the city-manager form of government and delegated extensive authority to its city manager.

15.     Defendant Edward "JR" Trevino, II, is the mayor of Castle Hills.

16.     Defendant John ("Johnny") Siemens is the chief of the Castle Hills police department and was appointed to that position by a city manager.

17.     Defendant Alexander ("Alex") Wright is a practicing attorney who, although not a police officer by trade, acted as a special detective with the police department. On June 18, 2019, he was assigned by defendant police chief Siemens to

3

investigate a complaint against Sylvia made by defendant mayor Trevino. The City has carried Wright's law enforcement commission for many years, even though Wright is not an active duty officer and is not employed by the City.

## Statement of Facts

### Sylvia

18.    Sylvia Gonzalez is 74 years old.

19.    She comes from a law-enforcement family dedicated to public service.

20.    Sylvia's father was a police officer.

21.    Sylvia's daughter is a police officer.

22.    Sylvia's niece and cousins are police officers.

23.    Other than the charge at issue in this case, Sylvia has no criminal record.

24.    After a fulfilling career in communications, Sylvia successfully ran for a seat on the Castle Hills city council and spoke out against the politically powerful in her small hometown by criticizing city manager Ryan Rapelye and participating in an effort to organize a nonbinding citizens' petition to remove him from office.

25.    After Defendants learned about Sylvia's criticisms of Rapelye and assumed she was the driving force behind the petition advocating for his removal, they developed a plan to punish and intimidate Sylvia in retaliation for her political speech. The plan culminated in Sylvia's arrest under a misdemeanor statute for purportedly trying to steal the petition she herself championed. The statute has never been used to arrest a person in an analogous situation.

26.     Defendants intended for Sylvia—a harmless and peaceful woman in her seventies, who presented no threat to anyone and was no risk of flight— to spend the day in jail. That's why they obtained a warrant, instead of a summons, and also bypassed the Bexar County district attorney's office—the default practice for those accused of nonviolent crimes, which would have afforded Sylvia an opportunity to be processed through a satellite booking, rather than going to jail. As it happens, the district attorney's office, upon later review, dismissed the charges against Sylvia.

### Castle Hills

27.     Defendant Castle Hills is a city with fewer than 5,000 residents.

28.     The City's government is controlled by a small group of politically powerful people (including the mayor, chief of police, and city manager).

29.     The mayor of Castle Hills is an elected position. The mayor serves as the presiding officer of the city council. The mayor casts a tie-breaking vote on the city council and has the power to call special council meetings.

30.     The chief of police of Castle Hills is appointed by the city manager and reports to the city manager. The appointment is subject to approval by the city council. The chief of police is in charge of the police department and oversees its operations and budget. Among other duties, the chief of police oversees criminal investigations.

31.     The Castle Hills city council is the five-member executive body of the City. The members are elected for two-year terms. They vote to set policy, adopt the

City's budget, approve purchases and contracts, and review laws. They also appoint executive officials, such as the city manager and city attorney.

32.     The city manager of Castle Hills is appointed for an indefinite period by the city council and is in charge of most day-to-day decision-making. The city manager's powers include ensuring enforcement of all city laws; receiving and accounting for all city moneys; managing city contracts; appointing and removing department heads and subordinate city employees; preparing the city budget; and acting as the editor of the city newsletter, *The Reporter*.

33.     The city attorney for Castle Hills is appointed by the city council. The city attorney serves as a legal adviser to the council, the city manager, and all other officers, boards, and departments of the City. Among other duties, the city attorney reviews articles published in the city newsletter, *The Reporter*.

***Sylvia Runs for Office.***

34.     When Sylvia decided to run for office, she was prepared for a grueling campaign to unseat her opponent, who was a well-connected incumbent supported by the City and the Individual Defendants.

35.     Sylvia campaigned house-to-house, knocking on countless doors and personally meeting with more than 500 Castle Hills families.

36.     Sylvia was not prepared, however, for the degree of negative feedback she would receive about the City during her campaigning.

37.     Castle Hills residents complained to Sylvia about corruption and other problems with the City and the Individual Defendants.

38.    Although she did not know him personally, Sylvia was deeply disturbed by stories about city manager Ryan Rapelye.

39.    As one example, Sylvia heard that Rapelye had falsely accused his secretary of stealing city documents, having her detained by Castle Hills police, and forcing her to take a lie detector test before firing her.

40.    While campaigning, Sylvia also heard allegations that the City and the Individual Defendants were steering city policy and resources away from resident services and toward enriching city employees.

41.    Beyond the stories, many residents conveyed frustration with Castle Hills government and with city manager Rapelye. One resident suggested Sylvia organize a petition to express discontent with Rapelye's performance.

***Sylvia Wins the Election.***

42.    On May 4, 2019, Sylvia was elected as the first Hispanic councilwoman in Castle Hills history.

43.    On May 14, 2019, Sylvia was sworn in as a member of the council by Bexar County sheriff Javier Salazar.

44.    City attorney Schnall was present at Sylvia's swearing-in ceremony.

45.    Schnall did not object to any part of the swearing-in, and even applauded at the completion of the ceremony.

***Sylvia Takes Office and Takes on the City and the Individual Defendants.***

46.    As her first act in office, Sylvia participated in organizing a citizen-signed, nonbinding petition calling for the removal of city manager Rapelye from office. *See* Exhibit A, the Petition.

47.    The petition was a pure expression of political speech. It had no legal force. It was designed to simply express the discontent of Sylvia's constituents with Rapelye's performance as city manager and was signed by more than 300 Castle Hills residents.

48.    The petition had six concise bullet points and was titled "FIX OUR STREETS Reinstate former City Manager Diane Pfeil." *Id*.

49.    The petition proposed that city council replace Rapelye with Diane Pfeil, a previous city manager who had been removed from office after repeatedly clashing with defendant Siemens (deputy police chief at the time) and defendant Trevino (then a councilmember), including over the use of civil forfeiture funds. *Id*.

50.    In addition, one of the bullet points in the petition criticized "various city managers" who came after Diane Pfeil for "ma[king] up priority lists and pa[ying] for expensive engineering studies." "None," the petition continued, "have fixed a single street." *Id*. Rapelye is one of the various city managers who came after Diane Pfeil.

51.    Defendants mistakenly believed that Sylvia collected all of the 300-plus signatures, even though she personally obtained just a fraction of this total number.

52.     Not everyone who heard from Sylvia signed her petition. Chalene Martinez, a resident with connections to the City and the Individual Defendants, declined to sign.

53.     On May 21, 2019—Sylvia's first council meeting—a resident submitted the petition to the city council

54.     To Sylvia's surprise, the City and the Individual Defendants expected its submission.

55.     Citizens with connections to the City and the Individual Defendants, including Mike Flinn, Bonnie Hopke, and Robbie Casey, attended the council meeting and testified against the petition.

56.     Chalene Martinez—a citizen who had refused to sign the petition when asked by Sylvia—also testified in opposition to the petition.

57.     According to Martinez, Sylvia asked her to sign the petition "under false pretenses."

58.     Martinez did not elaborate further.

59.     Due to its contentiousness, the meeting was ultimately carried over to the next day, May 22, 2019.

60.     The May 22 meeting remained tense, while the city council argued over city manager Rapelye's job performance.

61.     Importantly, Sylvia and defendant mayor Trevino sat next to each other at the council table during council meetings.

62.     When the meeting was finally over, Sylvia got ready to go, picking up all of the hand-outs on her side of the dais and placing them in her binder.

63.     Before she could leave, the city council secretary walked up to Sylvia and told her that Amy McLin— the incumbent unseated by Sylvia—had an immediate open records request for Sylvia and was waiting to give it to her.

64.     Sylvia left her belongings—including her document binder—on the dais, and went to talk to McLin, who asked Sylvia for all the notes Sylvia took during the May 21 meeting related to the questions Sylvia asked of Rapelye.

65.     Sylvia responded that she threw away the post-its but that if McLin wanted to hear the questions, they were available on the Castle Hills' YouTube channel.

66.     Sylvia's fellow councilmember, Clyde "Skip" McCormick, who was standing next to McLin, threatened to have Sylvia arrested and "sent to federal prison" if she didn't hand over a copy of her meeting notes.

67.     During this entire conversation, Sylvia was standing with her back to the dais.

68.     At some point during the conversation, a police officer in charge of the safety—Captain Steve E. Zuniga—tapped on Sylvia's shoulder and told her that defendant mayor Trevino wanted to talk to her. Exhibit B, Castle Hills Police Department Offense/Incident Report, at 5.

69.     Sylvia turned around and, escorted by Zuniga (which she found rather strange), went back to the dais, where defendant Trevino and she had been sitting next to each other during the meeting.

70.     With Captain Zuniga by his side, defendant Trevino asked Sylvia: "Where's the petition?"

71.     Sylvia replied: "Don't you have it? It was turned in to you yesterday."

72.     Responding in the negative, defendant Trevino then asked Sylvia to look for the petition in her binder.

73.     Sylvia did and, much to her surprise, found the petition there.

74.     When Sylvia handed the petition to defendant Trevino, he stated: "You probably picked it up by mistake."

75.     The two parted ways, with Sylvia not thinking much of the encounter.

76.     Sylvia did not intentionally put the petition in her binder.

77.     Sylvia never left the council room with the petition. Indeed, she never even left the council table with the petition.

78.     Sylvia had worked hard to help organize the petition and ensure its submission to city council. The petition gave more force to Sylvia's own judgment that the city manager was not doing a good job. It would have been entirely illogical for Sylvia to try to take back the petition.

***Castle Hills and the Individual Defendants Retaliate Against Sylvia, Ultimately Securing Her Arrest.***

79.     The City and the Individual Defendants learned about Sylvia's petition from supporters like Chalene Martinez, whom Sylvia approached for her signature.

11

80.     The City and the Individual Defendants, acting under color of Texas law and cloaked in authority from Castle Hills, then developed a comprehensive plan to punish and deter Sylvia based on her political expression. The plan was to give Sylvia a taste of her own medicine by removing her from the city council.

81.     Castle Hills councilmember McCormick wrote about the Defendants' plan in the City's newsletter, distributed to residents on July 17, 2019, but written weeks ahead of time. To remove a council member, he said, residents could sue them for official misconduct or incompetency. Alternatively, if a councilmember is convicted of a felony or a misdemeanor involving official misconduct, it would operate as an immediate removal from office. Exhibit C, The Castle Hills Reporter, at 5-6 (July/August 2019).

82.     As the editor of the City's newsletter, city manager Rapelye saw the article well in advance of its publication.

83.     As a reviewer of the City's newsletter, city attorney Schnall also saw the article well in advance of its publication.

84.     In addition to the two options provided by councilmember McCormick, the City and the Individual Defendants developed a third: retaliate against Sylvia's speech by directly removing her from office through a manufactured technical failure in her swearing-in.

85.     The City and the Individual Defendants were motivated to punish Sylvia for her speech—and deter future speech—based on the content of that speech.

86.     Had the City and the Individual Defendants not harbored retaliatory animus toward Sylvia's speech, they would have never acted on any one of the three options in their plan.

**Option 1: Charge Sylvia with a crime and arrest her.**

87.     As described in councilmember McCormick's article, the surest way to remove a council member is by obtaining a criminal conviction against her.

88.     To punish Sylvia for championing the petition and to deter her from the future exercise of her First Amendment rights, the City and the Individual Defendants developed and executed a plan to manufacture criminal charges against Sylvia and have her thrown in jail.

89.     On May 24, 2019—two days after defendant mayor Trevino, with Captain Zuniga by his side, confronted Sylvia about purportedly stealing the petition that she supported—defendant police chief Siemens told another police officer— Sergeant Paul Turner—that defendant Trevino would be contacting the officer "in reference to the filing of a criminal complaint" against Sylvia, which defendant Trevino subsequently did. Exhibit B, at 4.

90.     After the complaint was filed, Sergeant Turner began his investigation by going to the homes of people who signed the petition and questioning them about this act of civil expression.

91.     Many of these individuals whom Sergeant Turner approached said they felt threatened by his actions and questions, as it was difficult to understand why a

police officer would be knocking on their doors and challenging their signatures on a nonbinding petition, with no force other than an expression of political thought.

92.   On June 18, 2019—with Sergeant Turner's investigation going nowhere—the City and the Individual Defendants changed strategy. Defendant Siemens turned to a trusted friend, defendant special detective Alex Wright, to take over Sergeant Turner's investigation.

93.   Defendant Wright is a private attorney, not a professional police officer, although he is a commissioned police officer in Texas and the Castle Hills Police Department has paid to carry defendant Wright's commission for years.

94.   While it is often true that in sensitive political cases local district attorneys employ private lawyers to act as special prosecutors, these lawyers are not deputized as police officers, cannot be affiants for warrants, and cannot walk warrants (bypassing local district attorneys in doing so).

95.   Defendant Wright—with the authorization provided to him by defendant Siemens—did all three. And defendant Wright did not act as a special prosecutor, he was tasked with investigating Sylvia as a detective.

96.   As part of his month-long investigation into Sylvia, defendant Wright interviewed defendant Trevino, Captain Zuniga, and city manager Rapelye.

97.   Following his investigation, the only charge defendant Wright could come up with was a Class A misdemeanor for tampering with a government record, for supposedly attempting to steal a petition that Sylvia herself championed. Tex. Penal Code § 37.10(a)(3), (c)(1).

98.   Defendants made the most of this charge, however, by doing three distinct things to ensure that Sylvia would be jailed based on it, rather than simply asked to appear before a judge.

99.   First, Defendants chose to obtain a warrant, rather than a summons— the procedure normally reserved for people suspected of nonviolent crime. Unlike warrants, summonses do not require a trip to jail.

100.   Second, Defendants didn't just obtain a warrant through normal channels, by going through the district attorney (the "DA"). Instead, they circumvented the DA by using a procedure typically reserved for violent felonies or emergency situations and walked the warrant directly to a magistrate. When the DA's office finally learned of the charges and reviewed them, it dismissed them.

101.   Third, by using the procedure that circumvented the DA, Defendants also ensured that Sylvia would not be able to avoid jail by taking advantage of the satellite booking function, provided by the Bexar County jail system to weed out nonviolent offenses. This function allows individuals with outstanding warrants to be booked, processed, and released without being jailed. Because Sylvia's warrant was not acquired through the traditional channels, it was not discoverable through the satellite office's computer system, leaving Sylvia no option other than jail.

102.   It was bad enough that Sylvia was jailed for a nonviolent offense. Even worse, the charge itself was a sham, since the statute it utilized was never before used to charge people on facts even remotely similar to Sylvia's.

103. According to defendant Wright's affidavit, Sylvia violated the misdemeanor statute because she tried to steal the petition she herself championed. As evidence of the attempt, the affidavit, provided by Defendant Wright to a magistrate, used the brief, inconclusive statements made by Chalene Martinez during the meeting on May 21, as well as the allegations made by defendant Trevino in his complaint. The affidavit also accused Sylvia of being openly antagonistic toward city manager Rapelye. The affidavit did not dispute that Sylvia was expressing political speech. The issue was that this speech was intended to oust defendant Rapelye from his job. Indeed, the affidavit shows that Sylvia's speech was the motivation behind defendant Wright's investigation:

   a. "From her very first [council] meeting in May of 2019, [Sylvia] (along with another alderwoman) has been openly antagonistic to the city manager, Ryan Rapelye, wanting desperately to get him fired."

   b. "Part of her plan to oust Mr. Rapelye involved collecting signatures on several petitions to that effect."

   c. "Gonzalez had personally gone to [a resident's] house on May 13, 2019, to get her signature on one of the petitions under false pretenses, by misleading her, and by telling her several fabrications regarding Ryan Rapelye . . . ."

Exhibit D, Defendant Wright's Complaint/Affidavit for Warrant of Arrest, at 2, 5 (citing defendant Wright's interviews with defendant Trevino and Ms. Martinez).

104.    Importantly, there was no need to examine Sylvia's speech in order to determine whether there was probable cause to arrest her for theft.

105.    Furthermore, a review of misdemeanor and felony data from Bexar County over the past decade makes it clear that the misdemeanor tampering statute has never been used in Bexar County to criminally charge someone for trying to steal a nonbinding *or* expressive document.

106.    Of 215 grand jury felony indictments obtained under the tampering statute at issue in this case, not one had an allegation even closely resembling the one mounted against Sylvia. By far the largest chunk of the indictments involved accusations of either using or making fake government identification documents: altered driver's licenses, another person's ID, temporary identification cards, public safety permits, green cards, or social security numbers. A few others concerned the misuse of financial information, like writing of fake checks or stealing banking information. The rest are outliers, but all very different from Sylvia's situation. They concern hiding evidence of murder, cheating on a government-issued exam, and using a fake certificate of title, among others.

107.    Misdemeanor data is even more unremarkable. In each case available for review, the alleged tampering involved the use of fake social security numbers, driver's licenses, and green cards.

108.    The data, as well as the availability of procedures designed to allow people suspected of nonviolent offenses avoid going to jail, are clear: Defendants only had Sylvia arrested because they were harboring retaliatory animus toward her and

wanted to punish her for speaking out against city manager Rapelye and the entrenched interests of the City and the Individual Defendants he represented.

109.   Had the City and the Individual Defendants lacked retaliatory animus, the Defendants would not have devised, adopted, or implemented their plan, which resulted in Sylvia's arrest.

110.   Sylvia learned about a warrant for her arrest when she was in a doctor's office, waiting for her appointment.

111.   As the receptionist called her name, a neighbor called Sylvia on her cellphone and told her that she should turn herself in.

112.   Explaining to the receptionist that she had an emergency and had to leave, Sylvia went downstairs and waited for her husband to pick her up.

113.   The two septuagenarians then drove to the county jail.

114.   The 72-year-old councilwoman was booked on July 18, 2019, spending a terrifying day in jail, sitting, handcuffed, on a cold metal bench, wearing an orange jail shirt, and avoiding using the restroom, which had no doors and no toilet-paper holders. The entire time there, she was not allowed to stand up and stretch her legs.

115.   For someone who doesn't even have a speeding ticket on her record, this was quite an experience.

116.   Sylvia's name and mugshot were splashed across local media for days, and they are still on the internet.

**Option 2: Remove Sylvia from office for a made-up technicality.**

117.    While defendant Wright was buying time during his month-long investigation of Sylvia, the City and the Individual Defendants were considering alternative options to retaliate against Sylvia for her political speech. After all, their ultimate retaliatory goal was to intimidate, punish, and silence Sylvia by removing her from office. One way of achieving it was by arresting her and throwing her in jail. Another was by trying to remove Sylvia directly.

118.    On July 9, 2019, right before Sylvia approached her seat at the council table, city attorney Schnall pulled Sylvia into a room with one of his law partners, as well as defendant mayor Trevino and a non-resident friend of the mayor, where Schnall told Sylvia that she was not qualified to be a member of city council because she had been sworn in by a sheriff. To support his statement, Schnall invoked the Texas Government Code, according to which "[a]n oath . . . may be administered" by a sheriff, provided it is done when the sheriff "is engaged in the performance of the [sheriff's] duties" and "the administration of the oath relates to the [sheriff's] duties." Tex. Gov't Code § 602.002(17). Schnall argued that when sheriff Salazar swore in Sylvia, he was doing neither.

119.    Remarkably, Schnall—the city attorney, present at council meetings to ensure that necessary legal requirements are followed—had attended Sylvia's swearing-in by sheriff Salazar and raised no concerns at the time. Instead, he watched approvingly from mere feet away as Sylvia took her oath of office, applauding when she concluded.

120.    But now, motivated by retaliatory animus toward Sylvia, city attorney Schnall with the support of defendant Trevino declared that Sylvia had been improperly sworn in and was not qualified to remain in her seat on the council. Further, because more than 30 days had elapsed since Sylvia's election, Schnall stated that Sylvia could not be resworn. Instead, she had to be replaced by the Defendant's ally Amy McLin, whom Sylvia had beaten in the election.

121.    Sylvia's de facto removal by Schnall and defendant Trevino was not ratified by a vote of the city council as would have been required under Texas law. Instead, when the issue was raised at a council meeting, Schnall said it was not properly before the council and could not be taken up.

122.    Evidencing the retaliatory purpose of Sylvia's removal, Defendants had not attempted to take similar actions against council members who had been sworn in by sheriffs in the past, including two who were sworn in by a sheriff in 2014 and served out their terms without incident.

123.    More to the point, Defendants also did not question the legitimacy of defendant mayor Trevino's seat, even though he was sworn in by the Bexar County Precinct 3 commissioner Kevin A. Wolff. Just like with the sheriffs, the Texas Government Code qualifies the purpose for which commissioners can administer oaths of office, limiting it to "a matter pertaining to a duty of the . . . commission." Tex. Gov't Code § 602.002(6). If it is questionable whether a *sheriff's* administration of the oath relates to the sheriff's duties and falls within their scope, it is also questionable whether a *commissioner's* administration of the oath is a matter

pertaining to a duty of the commission. Yet, city attorney Schnall did not question the mayor's legitimacy, even though he and Sylvia were sworn in on the same day.

124.   Determined to address the concern and move on, Sylvia got resworn by a notary at a bank. She and her friend then went to the city manager's office to turn in the certificate, proving that she did so. As she was walking out the door, Sylvia overheard city manager Rapelye complain to someone: "You know what she did? She campaigned against me!"

125.   Sylvia also contested Defendants' decision to order her removal by securing a special council meeting to take up the issue on July 17, 2019. That's when the City and the Individual Defendants knew that the simple route of direct removal was not going to be so simple.

126.   So, on this same day, July 17, 2019, defendant Wright circumvented the Bexar County DA and walked the warrant for Sylvia's arrest to a judge. The following day Sylvia was arrested.

127.   After she was released from jail on bond, Sylvia sought a temporary restraining order against Castle Hills and Schnall enjoining her removal. A court granted the order the day after her filing, on July 23, 2019.

**Option 3: File a civil lawsuit against Sylvia to keep her off city council.**

128.   After a judge temporarily enjoined Defendants' attempt to unilaterally remove Sylvia from council on July 23, 2019, six Castle Hills residents, including Mike Flinn, Robbie Casey, and Bonnie Hopke—the three residents who, along with Chalene Martinez, testified against Sylvia's petition—filed a lawsuit in the name of the State of Texas to remove Sylvia for incompetence and official misconduct.

129.   Ironically, and further evidencing the existence of a high-level plan, criminal charges filed against Sylvia in retaliation for her political speech were cited as the main reason warranting Sylvia's removal.

130.   As with the Defendants' use of the criminal process, the residents' use of the civil process circumvented the district attorney's office.

131.   And as with the Defendants' use of the criminal process, when the district attorney learned of the residents' use of the civil process, he filed a motion to dismiss the action, stating that "removal may only proceed with the intervention of the District Attorney to represent the interest of the state" and that "the Bexar County Criminal District Attorney declines to further prosecute this removal."

132.   When the six residents filed their objections to the motion of nonsuit, the district attorney further elaborated that "after a careful and independent investigation [it determined that] neither the criminal charges against Defendants not this Chapter 21 removal action should proceed."

133.   After a district court judge dismissed the case and denied the motion for new trial, the six residents appealed this determination. As of the date of this complaint, their appeal is still pending.

134.   When Sylvia's attorneys—and later a trusted friend—reached out to Mike Flinn's counsel on her behalf, asking for Sylvia to be released from the lawsuit—since she was no longer on the city council and had already spent around $70,000 in attorney's fees—the counsel refused. During one of these conversations, Flinn's

counsel conditioned the release from the lawsuit on Sylvia signing an affidavit stating that she would never again run for the city council.

135.   Despite being initially unsuccessful in (1) obtaining a criminal indictment against Sylvia, (2) removing her from office based on the claim of being improperly sworn in, and (3) having a civil lawsuit filed to remove Sylvia, Defendants succeeded in their ultimate goal of intimidating and punishing Sylvia in retaliation for her political speech. Sylvia is no longer on the city council—since she could not afford never-ending attorney's fees caused by her arrest and by Schnall's and citizens' attempts to remove her— and will never again help organize a petition or participate in any other public expression of her political speech. She will also never again run for any political office.

## **Injury to Plaintiff**

### *Defendants Have Severely Harmed Sylvia.*

136.   The retaliatory arrest manufactured by the City and the Individual Defendants directly and proximately caused severe harms to Sylvia, including but not limited to:

  a. The harm to Sylvia's reputation.  Sylvia's mugshot was displayed repeatedly in the media, both in her community and beyond.  She was the subject of repeated news articles about her wrongful arrest.  To this day, harmful and embarrassing news articles with Sylvia's mugshot appear when one searches for her on the internet.  This harm continues to this day and is likely to continue in the future.

b. The harm to her future opportunities. Sylvia's arrest is a matter of public record. If she were to ever apply for a job (which is increasingly likely even for senior citizens, in times of economic uncertainly) or for public benefits, her chances of succeeding would be significantly diminished due to her criminal record. *See* Elisha Jain, *Arrests as Regulation,* 67 Stan. L. Rev. 809, 810 (2015); *see also* Gary Fields & John R. Emshwiller, Opinion, *As Arrest Records Rise, Americans Find Consequences Can Last a Lifetime,* Wall St. J. (Aug. 18, 2014), https://www.wsj.com/articles/as-arrest-records-rise-americans-find-consequences-can-last-a-lifetime-1408415402?st=cj2xuywlkthsmji.

c. The harm to her pocketbook. Sylvia had to pay a fee to be released from jail, a bondsman to secure her bond, and tens of thousands of dollars to lawyers to defend against the criminal charges.

d. The harm to her faith in the criminal justice system. Defendants' actions caused Sylvia to lose faith in the criminal justice system and law enforcement in Castle Hills, a place where she lives and where her family has worked in law enforcement.

e. The harm to her physical health. Stress brought on by the worry about her criminal prosecution led to many sleepless nights as well as anxiety-filled days, resulting in the overall deterioration of Sylvia's physical health.

## Causes of Action

### Count I
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (Retaliatory Arrest Claim Against Individual Defendants Trevino, Siemens, and Wright)

137. Sylvia realleges and incorporates by reference the allegations in Paragraphs 1 through 136 of this complaint, as if fully stated herein.

138. Sylvia's actions in championing the creation, signature, and submission of a nonbinding citizens' petition and urging the removal of city manager Rapelye from his job are safeguarded by the First Amendment to the United States Constitution.

139. Using their respective authorities under color of state law, the Individual Defendants subjected Sylvia to the deprivation of her rights under the First Amendment by retaliating against her for exercising those rights.

140. Motivated to punish and intimidate Sylvia for her exercise of free speech, the Individual Defendants engaged in various harmful acts against Sylvia in violation of clearly established First Amendment law, resulting in her arrest. These acts include:

> a. Defendant Trevino lodging a baseless theft complaint against Sylvia and participating in and encouraging a criminal investigation and the institution of criminal charges against Sylvia for her involvement with the petition.

b. Defendant Siemens instigating and overseeing a full criminal investigation and institution of criminal charges against Sylvia for an ostensible crime related to defendant Trevino's theft complaint.

c. Defendants Siemens and Trevino bringing in defendant Wright and tasking him with investigating Sylvia and manufacturing criminal charges against her.

d. Defendant Wright conducting a full criminal investigation of Sylvia under a "Tampering with Governmental Record" statute that is never used against individuals similarly situated to Sylvia; swearing out a misleading criminal complaint against Sylvia; and proceeding with a criminal arrest process meant to intentionally exclude the district attorney's involvement and foreclose any avenue for Sylvia to appear before a court—either by way of a summons or through the satellite office—rather than be jailed.

141.   The foregoing are actions independently unconstitutional but also were intended to send a warning to anyone else in Castle Hills bold enough to challenge the Individual Defendants' grip on power by exercising their First Amendment rights.

142.   It is clearly established that retaliating against individuals by arresting them under a law that is generally not used to arrest similarly-situated individuals is a violation of the First Amendment. Every reasonable government official would have had a fair warning that doing so and participating in a scheme to do so is unconstitutional.

143.    It is furthermore clearly established that retaliating against individuals by engaging in the various harmful acts described in Paragraph 140 is a violation of the First Amendment. Every reasonable government official would have had a fair warning that doing so and participating in a scheme to do so is unconstitutional.

144.    The facts also demonstrate that the criminal charge the Individual Defendants assigned to Sylvia was a sham charge, regardless of attempts to fabricate probable cause or convince a judge to sign an arrest warrant. Thus, even if probable cause existed, the application of an unenforced law to Sylvia is insufficient to outweigh the retaliatory animus illustrated by the surrounding circumstances. The facts, including the exclusion of the district attorney and his later dismissal of defendant Wright's charges against Sylvia, cannot objectively justify Sylvia's arrest.

145.    No other similarly situated individuals have ever been charged or arrested as Sylvia was.

146.    Moreover, the Individual Defendants were not acting under time constraint and made no split-second decisions regarding Sylvia's arrest.

147.    Furthermore, Sylvia's protected speech is not a legitimate consideration in determining whether to make an arrest based on the claim that she tried to steal the petition.

148.    The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Sylvia by chilling her ability to exercise her First Amendment rights and by causing her pecuniary loss and the deterioration of her health.

149.    Had it not been for the retaliatory animus, the Individual Defendants would have never arrested Sylvia for her actions related to supporting a nonbinding citizens' petition that did nothing other than express public discontent with the city government.

## Count II
### 42 U.S.C. § 1983 – First and Fourteenth Amendments
### (Retaliatory Arrest Claim against the City of Castle Hills)

150.    Sylvia realleges and incorporates by reference the allegations in Paragraphs 1 through 136 of this complaint, as if fully stated herein.

151.    Through the Individual Defendants, as well as through city manager Rapelye, city attorney Schnall, and councilmember McCormick, Castle Hills adopted and enforced an official policy or custom to retaliate against Sylvia for her First Amendment activities, namely the expression of her political thought through a nonbinding citizens' petition urging the firing of city manager Rapelye.

152.    As noted in Count I and elsewhere in the complaint, the City retaliated against Sylvia in violation of the First Amendment by concocting a scheme to arrest Sylvia on manufactured misdemeanor charges.

153.    This scheme was a part of an official policy or custom that was deliberate, long-term, and pervasive, unlike on-the-spot decisions to arrest, sometimes made by individual officers in split-second situations.

154.    The decision to arrest Sylvia can also be easily disentangled from her speech: unlike in some situations when an officer has to take speech into account when determining whether an arrest is warranted (for example content of speech

28

could indicate whether a suspect is ready to cooperate or presents a continuing threat), here, there was no need to consider the substance of the petition to determine whether the tampering statute was violated. Afterall, the basis for Sylvia's arrest was the allegation that she tried to steal her petition. The substance of the petition has nothing to do with evaluating whether the theft took place.

155.   The actions of the Individual Defendants, as well as city manager Rapelye, attorney Schnall, and councilmember McCormick are attributable to the City. As final policy-makers with final authority, or who were delegated final authority, these individuals made a deliberate choice to adopt a course of action that retaliated against Sylvia and resulted in her arrest. They also ratified these retaliatory acts.

156.   As city manager—imbued with the authority to appoint and supervise all city employees and departments—Rapelye is a municipal policymaker, and his decisions and actions described in this complaint represent official Castle Hills policy.

157.   As mayor—president of the city council—defendant Trevino is a municipal policymaker, and his decisions and actions described in this complaint represent official Castle Hills policy.

158.   As a council member, McCormick was a municipal policymaker, and his decisions and actions described in this complaint represent official Castle Hills policy.

159.   As police chief—executive head of the police department—defendant Siemens is a municipal policymaker, and his decisions and actions described in this complaint represent official Castle Hills policy. Alternatively, as policymakers

supervising and directing defendant Siemens, city manager Rapelye, councilmember McCormick, and defendant Trevino ratified defendant Siemens's actions as municipal policy.

160.   As special detective—charged directly by defendant Siemens and defendant Trevino with assigning criminal charge to Sylvia—defendant Wright's decisions and actions described in this complaint represent official Castle Hills policy. Alternatively, as policymakers supervising and directing defendant Wright, defendant Siemens, defendant Trevino, city manager Rapelye, and councilmember McCormick ratified defendant Wright's actions as municipal policy.

161.   As city attorney, who serves as a legal adviser to the council, the city manager, and all other departments of the City, Marc Schnall acted in a way that represented official Castle Hills policy. Alternatively, as policymakers supervising and directing Schnall, defendants Siemens and Trevino, city manager Rapelye, and councilmember McCormick ratified Schnall's actions as municipal policy.

162.   The actions undertaken or ratified by the City constitute the moving force behind the retaliatory arrest aimed at Sylvia's exercise of her First Amendment rights, which caused harm to Sylvia, including, but not limited to damage to her reputation, her health, her financial circumstances, and other adverse effects.

163.   Had it not been for the retaliatory animus, the City would have never caused, permitted, or approved Sylvia's arrest for championing a nonbinding citizens' petition that did nothing other than express public discontent with the city government.

164.   Alternatively, in recent years, there has been a persistent and widespread practice by Castle Hills of retaliating against city residents who voice criticism of the City or its officials or who petition the City for redress of grievances.

165.   In addition to what happened to Sylvia, Castle Hills has a history of cracking down on disfavored speech.

166.   For example, in 2017 or 2018, a local resident organized a petition to advocate for the closing of an impound lot in his neighborhood. To intimidate the resident and discourage him from submitting the petition, defendant Trevino—then a council member—along with the former police chief, the former mayor, and the former city manager showed up at the resident's home and threatened him.

167.   Similarly, in 2018, when another city resident put up opposition campaign signs on private front yards with owner permission, defendant Trevino's predecessor called and threatened him with an easement violation. "If this is the way y'all want to play the game," said the mayor in a voicemail message, "then I can order the police to just go ahead and write citations to everybody that has them in the easement and kinda, maybe report it that you were the one that started this."

168.   In 2016 and 2018, mayor Trevino, police chief Siemens, special detective Wright, and councilmember McCormick were in positions of power in Castle Hills. As such, they—as current policymakers—had actual or constructive knowledge of this unconstitutional policy or custom of retaliating against city residents who criticize Castle Hills or its officials or who petition the City for redress of grievances.

31

169.    But for the City's policy or custom of retaliation in response to criticism of those in power, Sylvia would not have been arrested, had her reputation dragged through the mud, subjected to abuse of process, and suffered various other harms that further serve to chill her First Amendment activities.

### Prayer for Relief

**WHEREFORE**, Sylvia Gonzalez seeks a judgment (1) declaring that the City and the Individual Defendants violated her rights under the First and Fourteenth Amendments to the United States Constitution, and (2) awarding her compensatory and punitive money damages against the City of Castle Hills, Texas; Edward "JR" Trevino, II; John Siemens; and Alexander Wright. Sylvia also seeks her attorney's fees and costs under 42 U.S.C. § 1988 as well as all other and further relief as the Court may deem just and proper.

### Jury Demand

Sylvia Gonzalez demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated: September 29, 2020          Respectfully submitted,

/s/ Anya Bidwell
Anya Bidwell (TX Bar No. 24101516)
Will Aronin*
Patrick Jaicomo*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
abidwell@ij.org
waronin@ij.org
pjaicomo@ij.org

* *Pro Hac Vice* motions to be filed

## CERTIFICATE OF SERVICE

I hereby certify that, on this 29th day of September, 2020, I electronically filed the Complaint with the Clerk of Court using the CM/ECF system.

I further certify that I caused a copy of the foregoing Complaint to be served via process server upon the following:

City of Castle Hills                   John Siemens
209 Lemonwood Drive                    209 Lemonwood Drive
Castle Hills, TX 78213                 Castle Hills, TX 78213

Edward "JR" Trevino, II                Alexander Wright
209 Lemonwood Drive                    5707 W I-10
Castle Hills, TX 78213                 San Antonio, TX 78201


/s/ Anya Bidwell