### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

SYLVIA GONZALEZ,

     *Plaintiff,*

v.

CITY OF CASTLE HILLS, TEXAS;

EDWARD "JR" TREVINO, II, Mayor of
Castle Hills, sued in his individual capacity;

JOHN SIEMENS, Chief of the Castle Hills
Police Department, sued in his individual
capacity; and

ALEXANDER WRIGHT, sued in his
individual capacity,

     *Defendants.*

Civil Action No. 5:20-cv-01151-DAE

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**INSTITUTE FOR JUSTICE**
Anya Bidwell (TX Bar No. 24101516)
Patrick Jaicomo*
Will Aronin*
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
abidwell@ij.org
waronin@ij.org
pjaicomo@ij.org
*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs Sylvia Gonzalez*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION................................................................................................................1

STANDARD OF REVIEW .................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT.......................................................................................................................5

    I.   Defendants wrongly argue that Sylvia's retaliatory arrest claims should be dismissed. ..............5

        A.   Plaintiff's case falls directly within the Supreme Court's holding in *Lozman*, which allowed a municipal liability claim based upon a retaliatory arrest. .......................................6

        B.   Plaintiff has properly alleged that the individual defendants unconstitutionally retaliated against Sylvia based upon her speech.........................................................................10

    II.  Qualified immunity does not shield individual defendants from liability........................................15

CONCLUSION..................................................................................................................18

## TABLE OF AUTHORITIES

**CASES**                                                                                               **PAGE(S)**

*Anderson v. Valdez,*
    845 F.3d 580 (5th Cir. 2016) ......................................................................... 1, 2, 15

*Arnold v. Williams,*
    No. 19-30555, ___ F.3d ___, 2020 WL 5668461
    (5th Cir. Sep. 24, 2020) ................................................................................... 1, 2

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .......................................................................................... 1, 2

*Bart v. Telford,*
    677 F.2d 622 (7th Cir. 1982) ............................................................................ 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................................... 1, 2

*Bloch v. Ribar,*
    156 F.3d 673 (6th Cir. 1998) ............................................................................ 17

*Campbell v. Mack,*
    777 F. App'x 122 (6th Cir. 2019) ..................................................................... 17

*Connick v. Myers,*
    461 U.S. 138 (1983) .......................................................................................... 15

*Garcia v. City of Trenton,*
    348 F.3d 726 (8th Cir. 2003) ............................................................................ 17

*Groden v. City of Dallas,*
    826 F.3d 280 (5th Cir. 2016) ............................................................................ 8, 9

*Keenan v. Tejeda,*
    290 F.3d 252 (5th Cir. 2002) ...................................................................... *passim*

*Lozman v. City of Riviera Beach,*
    138 S. Ct. 1945 (2018). ............................................................................... *passim*

*Mazzeo v. Young,*
    510 F. App'x 646 (9th Cir. 2013) ..................................................................... 17

*Monell v. Dep't of Soc. Servs. of the City of New York,*
    436 U.S. 658 (1978) .......................................................................................... 6, 8

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ....................................................................................................10, 11, 14, 18

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) ............................................................................................................*passim*

*Robinson v. Hunt Cty.*,
    921 F.3d 440 (5th Cir. 2019) .................................................................................................6, 8

*Roy v. City of Monroe*,
    950 F.3d 245 (5th Cir. 2020) .................................................................................................17

*Whren v. United States*,
    517 U.S. 806 (1996) ................................................................................................................6

*Wilson v. Birnberg*,
    667 F.3d 591 (5th Cir. 2012) .................................................................................................1

*Wilson v. Layne*,
    526 U.S. 603 (1999) ................................................................................................................17

## STATUTES AND RULES

42 U.S.C. § 1983 ...............................................................................................................................6

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................*passim*

Plaintiff Sylvia Gonzalez ("Sylvia") respectfully submits this response in opposition to defendants' Motion to Dismiss Pursuant to Rule 12(b)(6).

## INTRODUCTION

This case is about First Amendment retaliation. Municipal defendant Castle Hills and individual defendants Siemens, Trevino, and Wright (collectively, the "defendants") set out to (1) punish Sylvia for championing a nonbinding citizens' petition that challenged their hold on power and to (2) deter her from speaking out against them in the future. Defendants did so through an intentional and premediated plan to intimidate and punish Sylvia, culminating in her unconstitutional retaliatory arrest. Sylvia has stated a claim as to each defendant under governing Supreme Court precedent and the Motion to Dismiss should therefore be denied.

## STANDARD OF REVIEW

When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts in the complaint and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court does not need to determine whether the plaintiff's victory is probable. *Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012) (citation omitted). Rather, the inquiry must focus on whether the facts pled, if true, would entitle the plaintiff to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "At the 12(b)(6) stage of litigation, it is inappropriate for a district court to weigh the strength of the allegations." *Arnold v. Williams*, No. 19-30555, ___ F.3d ___, 2020 WL 5668461, at *4 (5th Cir. Sep. 24, 2020). "Instead, the district court must simply decide if the complaint plausibly alleges a claim for relief." *Id.* "Dismissal is improper if the allegations support relief on any possible theory." *Wilson*, 667 F.3d at 595 (citation omitted).

When defendants raise qualified immunity as a defense at the motion to dismiss stage, "'the district court must'—as always—do no more than determine whether the plaintiff has 'file[d] a short and plain statement in his complaint, a statement that rests on more than conclusions alone.'" *Anderson*

*v. Valdez*, 845 F.3d 580, 589-90 (5th Cir. 2016) (citation omitted). Under that standard, "a plaintiff must plead qualified-immunity facts with the minimal specificity that would satisfy *Twombly* and *Iqbal.*" *Arnold*, 2020 WL 5668461, at *3. "[Section] 1983 claims implicating qualified immunity are not subject to a heightened pleading standard." *Id.* (citing *Anderson*, 845 F.3d at 590).

## BACKGROUND

Sylvia Gonzalez ran for office on a promise that she would make Castle Hills more responsive to its residents' needs and do her best to channel the City's resources into much needed and long overdue services, such as fixing the streets. Compl. ¶¶ 37, 40, 41. When she won, Sylvia participated in an effort to organize a nonbinding citizens' petition, which advocated for the removal of the city manager Ryan Rapelye and for fixing Castle Hills' streets. *Id.* ¶¶ 46-50.

To punish Sylvia and to deter her from ever again challenging their authority, defendants developed a retaliatory campaign of harassment against Sylvia. *Id.* ¶ 80. This retaliatory policy spanned several months and culminated in defendants unconstitutionally manufacturing criminal charges, and arresting Sylvia for "stealing" her own petition. *Id.* ¶¶ 25, 96, 117. Specifically, plaintiff alleges that the individual defendants—and the municipal defendant through its policymakers—retaliated against Sylvia for her speech and for presenting a non-binding petition against their interests. *Id.* ¶¶ 1-2.

Defendants took several concrete steps to harm and arrest Sylvia under their retaliatory policy. First, defendant mayor Trevino tasked defendant police chief Siemens with investigating and criminally charging Sylvia. *Id.* ¶ 89. Then, in turn, defendant police chief Siemens assigned a full-time police officer to investigate Sylvia and her petition, but that officer—rightly—found nothing to charge. *Id.* ¶¶ 89-92. Next, defendant police chief Siemens turned to an outsider—defendant special detective Wright. *Id.* ¶ 92. Defendant special detective Wright is not a police officer by trade, but rather is a full-time attorney in private practice with a police commission maintained by defendant Castle Hills. *Id.* ¶ 93. Defendant special detective Wright then spent the next month criminally investigating Sylvia based

upon the unreasonable and false allegation that she stole her own non-binding petition. *Id.* ¶¶ 95-97. Finally, even after this month-long investigation, the only charge defendant special detective Wright could bring was one misdemeanor that has never been brought against someone for even remotely similar conduct, and certainly not against someone for stealing their own petition. *Id.* ¶¶ 97, 105-107. At no point did any defendant discuss this charge with, or get the approval of, the Bexar County District Attorney's Office, which ultimately dismissed the case against Sylvia. *Id.* ¶ 100.

In addition to the charge itself, defendants intentionally used a special procedure to ensure that Sylvia was jailed rather than allow her appear in Court, as would otherwise have been typical. *Id.* ¶ 101. Specifically, rather than issue a summons for this single non-violent misdemeanor, defendant special detective Wright personally obtained a warrant to arrest the 72-year-old, thereby ensuring that she would spend time in jail rather than remaining free and appearing before a judge. *Id.* ¶ 114.

The retaliatory arrest and policy are the constitutional violations alleged in this case. *Id.* ¶ 3. But defendants also took other actions to punish and silence Sylvia which further show the municipal policy or custom. *Id.* ¶¶ 79-86, 117-35. For example, while defendant special detective Wright was investigating Sylvia for stealing her own petition, defendant mayor Trevino worked with other policymakers, including city attorney Schnall, to strip Sylvia of her council seat using a made-up technicality relating to the manner in which she was sworn in. *Id.* ¶¶ 117-27. Without going into detail, Sylvia was sworn in by a Sheriff—just as others had been before her. *Id.* ¶¶ 118-19, 122. Defendant mayor Trevino and city attorney Schnall, however, asserted that the Sheriff was not "engaged in the performance of his duties," and therefore the swearing-in was improper and that Sylvia must be removed. *Id.* ¶ 118. This technicality has never before been used against other councilmembers, and the rationale could even arguably apply to defendant mayor Trevino himself. *Id.* ¶¶ 122-23. Instead, this was just another way for defendants to retaliate against Sylvia and silence her. Moreover, city attorney Schnall did not allow the city council to vote on his decision to remove Sylvia from office.

3

*Id.* ¶¶ 120-21. In response, Sylvia filed suit and a judge issued a temporary restraining order enjoining the defendants from moving forward with Sylvia's removal. *Id.* ¶ 127.

Next, having failed to remove Sylvia through a technicality, six Castle Hills residents—all closely allied with defendant mayor Trevino—filed a lawsuit in the name of the State of Texas to remove Sylvia from office for incompetence and official misconduct, citing the criminal charges filed against Sylvia as a reason. *Id.* ¶¶ 128-31. When Sylvia—though her lawyers and a trusted friend—pleaded with the residents to be released from the lawsuit (since she was no longer on the city council), her pleas were rebuffed, unless she signed an affidavit promising that she would never again run for the city council. *Id.* ¶ 134.

Further, at the same time defendants were misusing the legal process to arrest and remove Sylvia from office, councilmember and Castle Hills policymaker Skip McCormick published an article in the city newsletter discussing how either an arrest or the exact type of lawsuit filed by these six residents could be used to remove a councilmember from office. *Id.* ¶ 81. This contemporaneous publication strongly suggests internal discussions between Castle Hills policymakers about Sylvia and what steps they could—and ultimately did—take to punish and silence her.

Finally, it's important to highlight that defendants consistently acted without any backing or ratification from outside law enforcement. Specifically, defendants never obtained approval from the District Attorney to arrest a sitting councilwoman, and the D.A. dismissed the charges once it got involved. *Id.* ¶¶ 26, 100, 126. Similarly, in filing suit, the six residents used a process intended only for the District Attorney's Office. Here too, once the D.A. got involved, it moved to dismiss the case saying that "after a careful and independent investigation [it determined that] neither the criminal charges against [Sylvia] nor this Chapter 21 removal action should proceed." *Id.* ¶ 132.

Defendants ultimately succeeded in intimidating Sylvia and punishing her for her political speech. Sylvia is no longer on the city council. *Id.* ¶ 135. Her experience in jail, the embarrassment she

has suffered from all the negative publicity she has received, and the never-ending attorney's fees all chilled her desire to ever champion another petition challenging the defendants' authority or to run for local office. *Id.* ¶¶ 8, 135.

In sum, the allegations of the complaint establish that the defendants caused Sylvia to be charged with a crime under a statute that had never been used to charge anyone who had engaged in similar alleged conduct, and further caused her to be jailed using a procedure that was not typically used for similar nonviolent offenses. The defendants did this by deliberately bypassing other local legal authorities, including the county district attorney—who promptly dropped the charges once he learned of the case. They did all this for the purpose of retaliating against Sylvia for her past First Amendment activity and deterring her future First Amendment activity. Their plan worked. It was also, as explained below, unconstitutional.

## ARGUMENT

Plaintiff's argument is broken into two sections. *First*, Section I will argue that Sylvia has adequately pleaded both of her causes of action and should be permitted to proceed on the merits. Part IA focuses on municipal liability and shows that plaintiff's claim is squarely in line, and pleaded in accordance, with the claim permitted by the United States Supreme Court in *Lozman v. City of Riviera Beach,* 138 S. Ct. 1945, 1954 (2018). Part IB addresses Sylvia's cause of action against the individual defendants and argues why Sylvia should be allowed to proceed on her First Amendment retaliatory arrest claim irrespective of whether or not there was probable cause for Sylvia's pretextual arrest. *Second*, Section II will argue why qualified immunity does not shield defendants from liability.

**I.  Defendants wrongly argue that Sylvia's retaliatory arrest claims should be dismissed.**

Sylvia has properly alleged her claims for municipal and individual liability.  Furthermore, she has valid First Amendment retaliation claims against the individual defendants and the municipality, without having to plead and prove the absence of probable cause for her arrest.

First, Sylvia has pleaded a claim for municipal liability based upon a retaliatory policy that is similar to the one approved of by the United States Supreme Court in *Lozman*. Second, Sylvia has pleaded a viable cause of action against the individual defendants, and, contrary to the defendants' assertions, *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), only strengthens Sylvia's argument that hers is the type of a case that should be allowed to proceed.[1]

### A. Plaintiff's case falls directly within the Supreme Court's holding in *Lozman*, which allowed a municipal liability claim based upon a retaliatory arrest.

Plaintiff's *Monell* claim is squarely in line with the one permitted by the United States Supreme Court in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018). There, the Court held that a municipality can be liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), when its leadership decides to punish a particular person in retaliation for their speech. *Id.* Even if the city can find probable cause for some infraction, it is still unconstitutional to arrest someone based upon a premediated plan to intimidate or punish them for speech. *Id.* at 1954-55. This is exactly what Sylvia alleges—that Castle Hills leadership and policymakers formed a plan to intimidate and punish Sylvia for her petition and that plan was the reason defendants arrested her.

"To state a claim for municipal liability under 42 U.S.C. § 1983, a plaintiff must allege (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (internal quotations omitted). Plaintiff has done so.

---

[1] Defendants make much of the independent intermediary doctrine, *see* Defs.' Br. at 9, but it does not apply here. Sylvia does not allege a Fourth Amendment violation, though—to be sure—no fact discovery has taken place that could illuminate potential Fourth Amendment issues. Sylvia's claim is that she was retaliated against in violation of her *First* Amendment right that forbids government officials from punishing and intimidating those who speak out against them. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (reasoning that an act which is lawful under the Fourth Amendment may still violate other provisions of the Constitution).

Just as in *Lozman*, plaintiff alleges that the city formed an official policy to intimidate *her* through a "premediated plan… in retaliation for [her] criticisms of city officials[.]" *Lozman*, 138 S. Ct. at 1954. Sylvia's arrest was one part of the plan—as was (i) removing her from office through a technicality, and (ii) manufacturing a civil suit against her that would only be dismissed if she signed an affidavit swearing not to run for office again. Compl. ¶ 134. But the policy as a whole was to target Sylvia personally to intimidate, punish and silence her. That's why it's relevant that the city brought in defendant special detective Wright: leadership wanted to hurt Sylvia so they brought in a ringer who spent a month finding something—anything—to arrest her for. That's not normal, but it's pretty intimidating.

It is worth emphasizing how similar Sylvia's case is to *Lozman*. Fane Lozman was an "outspoken critic" of local leadership who "often spoke" during city council meetings and "criticized councilmembers, the mayor, and other public employees." *Lozman*, 138 S. Ct. at 1949. Here, Sylvia alleges that she "spoke out against the politically powerful… and participat[ed] in an effort to organize a nonbinding petition to remove [the city manager] from office." Compl. ¶ 24. Lozman alleged that the city formed a premediated plan to punish and silence him. 138 S. Ct. at 1954. Here, Sylvia alleges that defendants "adopted a plan to retaliate against Sylvia for her protected speech, resulting in Sylvia's arrest on manufactured misdemeanor charges[.]" Compl. ¶ 2. In *Lozman*, as part of that policy, the city arrested Lozman for disorderly conduct when he disturbed a council meeting. 138 S. Ct. at 1949-50. Everyone agreed there was probable cause to arrest Lozman for disorderly conduct, *id.*, but Lozman alleged the city nevertheless would not have done so except that it furthered the policy of intimidation. *Id.* at 1954. Here, Sylvia alleges that "defendants charged Sylvia under a statute that has never before or since been used to arrest individuals similarly situated to Sylvia." Compl. ¶ 4. The Supreme Court allowed Lozman to pursue a municipal liability claim under these facts, and this Court should do the same for Sylvia.

Defendants may not arrest people under a retaliatory policy, even if they can show probable cause. *Lozman*, 138 S. Ct. at 1954-55. "An official retaliatory policy is a particularly troubling and potent form of retaliation," which is why Lozman "need not prove the absence of probable cause to maintain a claim of retaliatory arrest" under *Monell*. *Id.* The policy was to find ways to harm Lozman individually; the arrest was just one means of doing so. Similarly, here, the policy was to target Sylvia personally. *Id.* ¶ 151. Removing her, suing her, and arresting her were all actions taken under that policy. *Id.* ¶¶ 151-69. But arresting and jailing Sylvia were constitutional violations.

Plaintiff has also pleaded that her arrest was "a constitutional violation whose moving force [was] that policy (or custom)." *Robinson*, 921 F.3d at 447. Specifically, Sylvia stated that had Castle Hills lacked animus toward Sylvia's speech, it would have never devised, adopted or implemented its policy of retaliation. Compl. ¶ 88, 108-09, 162. This is sufficient at the pleading stage. *See, e.g., Groden v. City of Dallas*, 826 F.3d 280, 286-87 (5th Cir. 2016) (holding that for purposes of a 12(b)(6) motion, when it comes to the allegations of moving force, it is enough that the plaintiff pleads that the policy was the reason for the arrest).

Defendants' only argument on this prong has been directly foreclosed by the United States Supreme Court. *Lozman*, 138 S. Ct. at 1955. In their motion, defendants state, "Plaintiff cannot show that a City policy *caused* her alleged constitutional violation. A Bexar County District Judge found probable cause and issued a warrant for Plaintiff's arrest. The issuance of the warrant negates causation." Defs.' Br. ¶ 37 (internal citation to defendant Wright's affidavit omitted). This argument is in direct opposition to the Supreme Court holding in *Lozman* and is wrong.[2] *Lozman*, 138 S. Ct. at 1955.

---

[2] It should also be noted that defendants do not cite *Lozman* at all in their brief. *See gen.* Defs.' Br.

Finally, plaintiff alleges that Castle Hills acted through its official policymakers, who knew of, and participated in, the retaliatory policy. In fact, plaintiff pleaded that two of the individual defendants—mayor Trevino and police chief Siemens[3]—were policymakers and participated in the retaliatory policy. Compl. ¶¶ 157, 159. Plaintiff also pleaded that city manager Rapelye, city attorney Schnall, and then-council member McCormick were policymakers who participated in, and had knowledge of, the retaliatory policy challenged here. *Id.* ¶ 151. Even more, plaintiff alleges that these named municipal policymakers ratified defendant special detective Wright's actions as municipal policy. *Id.* ¶ 160.

Plaintiff has identified several Castle Hills politicians who she intends to prove were municipal policymakers and alleges that, together, they formed a premediated plan to intimidate and punish Sylvia for her speech. *Id.* ¶¶ 153-63. She has also pleaded that one policymaker, then-council member McCormick, published a contemporaneous article detailing how a councilmember can be removed if she is arrested or if residents file a particular civil suit seeking her removal. *Id.* ¶ 81. Sylvia had also pleaded that other policymakers saw the article well in advance of its publication. *Id.* ¶¶ 82, 83. This article was written weeks before defendants took the very actions outlined therein. *Id.* ¶ 81. At the very least, this publication strongly suggests internal discussions between Castle Hills policymakers about Sylvia and what steps they could—and ultimately did—take to punish and silence her.

That said, these arguments are beyond what is required at the pleading stage. *Groden*, 826 F.3d at 286 ("[F]or the purpose of a 12(b)(6) motion," plaintiffs need not specifically identify the policymaker, only allege enough for a "reasonable pleading inference" that the policy was "attributable to an official policy made by the policymaker[.]").

---

[3] Tellingly, defendants seem to even acknowledge that plaintiff may be able to prove her allegations regarding the identity of the policymakers when the time comes. Defs.' Br., ¶ 35 ("Mayor Trevino may be a final policy maker for certain purposes . . . Chief Siemens may be a final policy maker for certain purposes . . . .).

Sylvia pleaded exactly what she should to allege a municipal retaliatory arrest claim under *Lozman* and should be permitted to prove her case on the merits. *Lozman* 138 S. Ct. at 1954 ("This unique class of retaliatory arrest claims, moreover, will require objective evidence of a policy motivated by retaliation *to survive summary judgment*.") (emphasis added).

### B. Plaintiff has properly alleged that the individual defendants unconstitutionally retaliated against Sylvia based upon her speech.

Sylvia pleaded a viable cause of action against individual defendants for their retaliatory arrest. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Under *Mt. Healthy*, if a plaintiff can show that a government actor unconstitutionally took their speech into consideration when taking some action against them, they state a First Amendment claim. *Id.* at 287; *see also Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Sylvia need only plead enough facts to allege that she had a constitutionally protected right to speak out against the government and that, because she exercised this right, the individual defendants investigated her and threw her in jail. *Mt. Healthy,* 429 U.S. at 287. Sylvia unquestionably satisfies this burden. In her complaint, Sylvia specifically states that she supported a nonbinding citizens' petition to advocate for the removal of city manager Ryan Rapelye, which is a core First Amendment right. Compl. ¶¶ 1, 9, 46-50. Sylvia also states that as a result of her involvement with the petition, she was subjected to a harassment campaign, which included Sylvia being investigated under a charge that is not brought against people in circumstances similar to Sylvia's and being thrown in jail, even though, as a general rule, people accused of non-violent crimes get processed through a courtroom. *Id.* ¶¶ 79-116. In addition, Sylvia's complaint outlines her injuries and states that due to these injuries she will no longer support petition efforts against her government or speak out against it in any way. *Id.* ¶¶ 8, 135-36. Finally, Sylvia pleads enough facts to allege that the harassment campaign taken up by defendants against her was substantially motivated by her decision to exercise her First Amendment right and champion the petition. *Id.* ¶¶ 85-86, 108-09, 117, 120, 122; *see also generally id.* ¶¶ 79-135.

It is true that while the general retaliation law is governed by *Mt. Healthy*, the Supreme Court in *Nieves* articulated a narrow exception to *Mt. Healthy*, holding that "as a general matter," in retaliatory arrest cases involving law-enforcement officers, "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for arrest." *Nieves*, 139 S. Ct. at 1722-24. This is because it is "particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct" and the showing of no-probable-cause could ease such a determination. *Id.* at 1724. However, Sylvia's allegations are a far cry from the split-second decisions to arrest in "circumstances that are tense, uncertain, and rapidly evolving" that were the subject of *Nieves*. 139 S. Ct. at 1725 (citation omitted).

This exception to the general retaliation rule makes great sense when viewed through the facts of *Nieves*, which was written in the context of high-pressure policing during Arctic Man—a sporting festival in Alaska that invites lots of drinking and parties. *Id.* at 1720. Because "[s]nowmobiles, alcohol, and freezing temperatures do not always mix well," Arctic Man "poses special challenges for law enforcement." *Id.*

Plaintiff Bartlett—one of the festival's attendees—was briefly arrested by two officers during the festival. When Bartlett sued the officers for retaliatory arrest, the Supreme Court's decision to deny the claim without the showing of no-probable-cause turned on several crucial factual considerations. First, the decision to arrest was made within minutes, if not seconds, of the incident. *Id.* at 1720. Second, one of the main reasons for the arrest—in addition to Bartlett being very combative with one of the officers—was the content of Bartlett's speech. For example, Bartlett urged some of the partygoers to "not speak with the police" when the officers asked them to move their beer keg inside their RV, and also told one of the officers to not question a minor about his underage drinking. *Id.* at 1720-21. Third, the officers charged Bartlett under a disorderly conduct statute that is generally used to arrest people in the situation similar to Bartlett's. In other words, using this statute as the reason

for the arrest did not "pose a risk that some police officers may exploit the arrest power as a means of suppressing speech." *Id.* at 1727 (quoting *Lozman*).

All three of these factual considerations—which are generally present in retaliatory arrest cases involving time-pressured decision-making—made the Supreme Court reject the general retaliation standard in this context. After all, unlike in general retaliation litigation, district courts in many retaliatory arrest cases are faced with a "causal challenge" that makes it very difficult to effectively identify the causal link between the retaliatory motive and injury. *Id.* at 1722, 1724. If an officer must make a decision in a split-second situation, and content of the individual's speech provides this officer with "vital information" about the existence of the continuing threat, disentangling (1) the officer's animus toward the speech from (2) the officer's legitimate need to take the speech into consideration is complicated at best. *Id.* at 1724. Plus, if a statute at issue is widely used to arrest for this particular conduct, the presence of probable cause makes it very hard to argue that it was the animus that caused the arrest, and not the officer's good faith effort to do his job. *Id.* at 1724.

Recognizing this "causal challenge," the Court provided a "solution": "The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Id.* at 1724. But this rule does not apply across the board. In retaliatory arrest cases where "probable cause does little to prove or disprove the causal connection between animus and injury," no probable cause requirement applies, provided "a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1727.

Sylvia's case falls squarely outside of the *Nieves* "causal challenge" exception to the general retaliation rule. To begin with, Sylvia alleges several facts supporting that individual defendants "exploit[ed] the arrest power as a means of suppressing speech." *Nieves*, 139 S. Ct. at 1727.

First, unlike in *Nieves*, where the decision to arrest was made within minutes if not seconds, defendants here spent almost two months coming up with reasons to charge Sylvia and also with ways to ensure that instead of being processed through a courtroom, she would end up in jail. Compl. ¶¶ 87-101. The arrest itself was also not a split-second, high-intensity situation. When Sylvia learned of the warrant, she simply turned herself in. *Id.* ¶¶ 110-14.

Sylvia's case is also different from *Nieves* because the content of her speech was not a "legitimate consideration" for her arrest. *Id.* ¶¶ 85, 104, 147, 154. The plaintiff in *Nieves* was arrested because the words he said—discouraging partygoers from speaking to the police—caused the very disorderly conduct he was accused of. Defendants here did not need to take the content of the petition into account when they charged Sylvia with theft. Because they did, and because they had no legitimate reason to do so, the *Nieves* exception does not apply.

Furthermore, Sylvia's case falls outside of the *Nieves* exception because unlike in *Nieves*, there is plenty of evidence of retaliatory animus, as well as the fact that, had it not been for this animus, Sylvia would not have been investigated or thrown in jail. For example, defendants went out of their way to ensure that Sylvia—a 72-year-old woman with no criminal record—would end up handcuffed and in jail for being accused of committing a nonviolent crime. Compl. ¶¶ 98-101, 126. They not only chose to obtain a warrant, rather than summons (which is a traditional procedure reserved for people in Sylvia's situation), they also decided to circumvent the Bexar County District Attorney and walk the warrant directly to a judge. This particular step ensured that the satellite booking function, widely available to those with non-violent offenses, would not be available to Sylvia, again ensuring that her only option would be to spend time in jail. It is hard to imagine any reason—besides punishment and intimidation—for why there was a need to jail Sylvia rather than simply allow her to be processed through a courtroom. It is also hard to imagine that had it not been for defendants' retaliatory animus, they would have still proceeded with ensuring that she would be jailed.

In addition, retaliatory animus is evident from the data collected by Sylvia through open records requests to the Bexar County. The data produced by the county shows that neither the misdemeanor tampering statute, nor its felony counterpart, has ever been used to criminally charge someone for allegedly trying to steal a nonbinding or expressive document, such as the petition at issue in this case. Compl. ¶¶ 105-08. For example, of 215 grand jury felony indictments obtained under the tampering statute at issue here, not one had an allegation even closely resembling the one mounted against Sylvia. These indictments mostly involved accusations of either using or making fake government identification documents or misusing financial information. All of them had the underlying accusation of forgery being made on a government-issued document. Sylvia was not accused of forging anything, let alone a government-issued document. The defendants claimed she stole a nonbinding citizens' petition she herself championed. This is indeed the type of conduct that risks the exploitation of the "arrest power as a means of suppressing speech," which makes this case fall outside of the *Nieves* exception to the general retaliation law. *Nieves*, 139 S. Ct. at 1727. It also provides plenty of "objective evidence that [Sylvia] was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

In short, Sylvia should be allowed to proceed with her case. Not only did she show that the *Nieves* exception does not apply to her, she also provided this Court with objective evidence that the powers of arrest were used against her because she spoke out against the defendants and not because defendants thought that the theft allegation mounted against her justified her arrest. Additionally, Sylvia pleaded enough facts to satisfy the *Mt. Healthy* standard. She properly alleged that her exercise of free speech was a motivating factor behind individual defendants' retaliatory actions, which included investigating Sylvia and throwing her in jail. Sylvia also properly alleged that the injury that she suffered from these actions chilled her speech and would have chilled the speech of other people of ordinary firmness. The motion to dismiss Sylvia's individual claims should be denied.

## II. Qualified immunity does not shield individual defendants from liability.

Qualified immunity does not shield defendants from liability in this case. *See* Defs.' Br. ¶¶ 23-34. The purpose of qualified immunity is to protect those government officials who did not have fair warning that "the conduct then at issue violated constitutional rights." *Anderson*, 845 F.3d at 600. Defendants here had plenty of such warning. After all, the law is clear in this circuit and nationwide: The First Amendment prohibits "adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan*, 290 F.3d at 258. In other words, every reasonable official in defendants' shoes should have known that it is unconstitutional to punish and intimidate people on the basis of their protected speech.

There are two prongs to the qualified immunity analysis. The first prong deals with whether the conduct at issue would violate an actual constitutional right. *Anderson*, 845 F.3d at 600. The second prong asks whether this constitutional right was clearly established, to provide the government official with a fair warning. *Id.* Importantly, "[t]he law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* There is no requirement of an identical fact pattern to show that the right was clearly established. *Id.*

It is unquestionable that when people speak out against the government in the form of a nonbinding political speech, they engage in a constitutionally protected activity. *Connick v. Myers*, 461 U.S. 138, 145 (1983) (stating that "the Court has frequently reaffirmed that speech on public issues occupies the highest rung on the hierarchy of First Amendment values, and is entitled to special protection") (internal quotations omitted). Moreover, when government officials retaliate against people for doing so—for example, in the form of harassment, investigation, and arrest—these officials run afoul of the First Amendment. *Keenan*, 290 F.3d at 258 (reasoning that "if government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the

government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly.").

Sylvia properly alleged every element of this constitutional cause of action, including that (1) she engaged in a constitutionally protected activity, that (2) as a result, she was subjected to an adverse action—namely defendants' harassment, investigation, and arrest—that would chill a person of ordinary firmness from continuing to engage in this activity, and that (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Keenan*, 290 F.3d at 258; *see also* Part IB, *supra*.

The constitutional violation complained of by Sylvia is also clearly established. In her complaint, she alleges a campaign of harassment in retaliation for the exercise of her protected speech. Sylvia accuses defendants not only of arresting her, but also of investigating her for a prolonged period of time for a theft charge that is never brought against people in situations similar to Sylvia's. *See* Part IB, *supra*. Sylvia also complains that defendants engineered circumstances that would lead to Sylvia's arrest, rather than being processed through a courtroom, which is a normal route for people accused of nonviolent offenses. *Id.* Here, *Keenan* is particularly instructive. The case involved allegations of harassment by police officers in retaliation for other officers' speaking out against corruption in the constable's office. 290 F.3d at 256-57. This campaign involved stopping the plaintiffs at gunpoint during a traffic stop and detaining them for over thirty minutes, and also—during a separate incident—arresting one of the plaintiffs on a misdemeanor "deadly conduct" charge. *Id.* at 257, 259. The Fifth Circuit unequivocally stated that the First Amendment prohibits "adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Id.* at 258. It reversed the district court's summary judgment in favor of the defendants, and allowed the case to go back down for further proceedings. *Id.* at 261. Other circuits too have clearly established that government officials may not engage in campaigns of harassment to retaliate against protected speech.

*See, e.g., Campbell v. Mack*, 777 F. App'x 122, 135 (6th Cir. 2019) (finding that a jury could conclude that officer purposefully tightened plaintiff's handcuffs and performed a strip/cavity search because of plaintiff's protected speech); *Mazzeo v. Young*, 510 F. App'x 646, 648 (9th Cir. 2013) (finding law clearly established that sheriffs may not engage in a "campaign of harassment and humiliation" or "coercion, persuasion, and intimidation" in retaliation for protected speech (alterations omitted)); *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003) (concluding that mayor "engaged the punitive machinery of government in order to punish" plaintiff for her protected speech where the mayor instructed police to ticket her for parking in a spot past two-hour limit though the police rarely issued such parking tickets); *Bloch v. Ribar*, 156 F.3d 673, 676, 679–80 (6th Cir. 1998) (denying qualified immunity where officer publicly shared embarrassing details regarding plaintiff's rape claim in retaliation for protected speech); *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982) (finding retaliatory actions where mayor "orchestrated a campaign of petty harassments designed to punish [plaintiff] for having run for public office"). Together, these four circuits make up an additional "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

It is true that *Keenan* required the no-probable-cause showing in order to establish the first amendment retaliatory arrest claim. But that was before *Nieves* clarified the types of cases that actually fall within the *Nieves* exception to the general retaliation-law standard. As the Fifth Circuit itself acknowledged in *Roy v. City of Monroe*, 950 F.3d 245 (5th Cir. 2020), if the *Nieves* exception does not apply—which is the case here, *see* Part IB, *supra*—then there is no need to produce such a showing. *Id.* at 255 n.4 (declining to relax the probable cause requirement in the application of the qualified immunity standard because the plaintiff failed to argue that the *Nieves* standard should not apply and there was also no such showing in the record). In fact, under such circumstances, the officers are provided with fair warning that they cannot hide behind probable cause when they retaliate against

someone for exercise of their protected speech. *See, e.g., Keenan*, 290 F.3d at 262 (reasoning that "[i]f no reasonable police officer could have believed that probable cause existed for the law enforcement actions of [the defendants] against the plaintiffs, then their retaliation violated clearly established law in this circuit"). After all, *Nieves* is clear that if the crime alleged does not ordinarily provoke an arrest, no retaliatory arrest can be made. Qualified immunity should not prevent Sylvia from continuing with this suit.

## CONCLUSION

Sylvia filed this complaint to vindicate her First Amendment right of free speech, which was infringed upon when defendants retaliated against her for exercising it. Because Sylvia pleaded sufficient facts to allege retaliatory arrest claims against the individual defendants and the municipality, her case should be allowed to go forward. First, Sylvia's municipal liability claim is directly in line with the one approved of in *Lozman*. Second, the *Nieves* exception to the general retaliation law as outlined in *Mt. Healthy* does not apply to Sylvia's claims, because they do not create the "causal challenge" for identifying the link between the animus and the arrest outlined in *Nieves*. Finally, in light of *Nieves*, this Court's own law on retaliatory arrests and harassment campaigns, and the precedent in other circuits, qualified immunity does not apply. For these reasons, Plaintiff Sylvia Gonzalez respectfully request that the Court deny defendants' Motion to Dismiss.

Dated: October 26, 2020                   Respectfully submitted,

                                          /s/ Anya Bidwell
                                          Anya Bidwell (TX Bar No. 24101516)
                                          Patrick Jaicomo*
                                          Will Aronin*
                                          Institute for Justice
                                          901 North Glebe Road, Suite 900
                                          Arlington, VA 22203
                                          (703) 682-9320
                                          abidwell@ij.org
                                          waronin@ij.org
                                          pjaicomo@ij.org
                                          * Admitted *Pro Hac Vice*

                                          *Attorneys for Plaintiffs Sylvia Gonzalez*


# CERTIFICATE OF SERVICE

I hereby certify that, on this 26th day of October, 2020, I electronically filed the forgoing

document with the Clerk of Court using the CM/ECF system which will send a notice of electronic

filing to all counsel of record.

                                          /s/ Anya Bidwell