IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SYLVIA GONZALEZ, § | |
| § | |
| *Plaintiff*, § | |
| v. § | CIVIL ACTION NO. 5:20-cv-01151-DAE |
| § | |
| CITY OF CASTLE HILLS, et al., § | |
| § | |
| *Defendants*. § | |

### FIRST AMENDED COMPLAINT FOR RETROSPECTIVE RELIEF[1]

Plaintiff Sylvia Gonzalez hereby sues the City of Castle Hills, Texas ("Castle Hills" or "City") for its deprivation of her rights under the First and Fourteenth Amendments to the United States Constitution.

### Introduction

1. After being elected to the Castle Hills city council, Sylvia Gonzalez participated in organizing a nonbinding citizens' petition to urge the removal of Ryan Rapelye from his position as the Castle Hills city manager.

2. Getting wind of Sylvia's efforts and assuming she was the driving force behind the petition, Defendant Castle Hills adopted a plan to retaliate against Sylvia for her protected speech, resulting in Sylvia's arrest on manufactured misdemeanor charges of tampering with a government record.

3. This lawsuit seeks redress for that unconstitutional arrest.

---

[1] This Amended Complaint is submitted in connection with a settlement agreement and is not subject to Rule 12 as to this particular Amended Complaint. In the event that a final settlement is not reached, both parties agree that they do not waive their right to additional amendments and that those amendments would be subject to Rule 12.

4. Defendant charged Sylvia under a statute that has never before or since been used to arrest individuals similarly situated to Sylvia.

5. Sylvia's arrest was unlawful because it was engineered and executed as part of a high-level policy to retaliate against Sylvia's exercise of political speech.

6. This was a long-term and pervasive policy and involved significant deliberations—outside of split-second decision making—by high-level officials.

7. Defendant succeeded in its attempts to punish and intimidate Sylvia, who, at the age of 72, made history as the City's first Hispanic councilwoman.

8. Sylvia, with her reputation ruined and her pocketbook significantly diminished, has been so traumatized by the experience that she will never again help organize a petition or participate in any other public expression of her political speech. She will also never again run for any political office.

9. There is nothing more fundamental to our system of government than its founding principle that the First Amendment protects political speech. This principle means little if local governments and their officials can—without consequence—punish and intimidate those who engage in political speech. This suit is filed in defense of this principle and to ensure the constitutional accountability of all government officials.

## Jurisdiction and Venue

10. This is a civil rights case brought under 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the United States Constitution.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

12. Venue is proper in this Court under 28 U.S.C. § 1391.

## The Parties

13. Plaintiff Sylvia Gonzalez is a citizen of the United States and long-time resident of Castle Hills, Texas.

14. Defendant City of Castle Hills, Texas, is a Type A general-law municipality located in Bexar County, Texas. The City's governing body consists of a mayor and five aldermen, commonly referred to as councilmembers. The City has adopted the city-manager form of government and delegated extensive authority to its city manager.

## Statement of Facts

*Sylvia Gonzalez.*

15. Sylvia Gonzalez is in her 70s.

16. She comes from a law-enforcement family dedicated to public service.

17. Sylvia's father was a police officer.

18. Sylvia's daughter is a police officer.

19. Sylvia's niece and cousins are police officers.

20. Other than the charge at issue in this case, Sylvia has no criminal record.

21. After a fulfilling career in communications, Sylvia successfully ran for a seat on the Castle Hills city council and spoke out against the politically powerful in her small hometown by criticizing city manager Ryan Rapelye and participating in an effort to organize a nonbinding citizens' petition to remove him from office.

22. After Defendant City learned about Sylvia's criticisms of Rapelye and assumed she was the driving force behind the petition advocating for his removal, they developed a plan to punish and intimidate Sylvia in retaliation for her political speech. The plan culminated in Sylvia's

3

arrest under a misdemeanor statute for purportedly trying to steal the petition she herself championed. The statute has never been used to arrest a person in an analogous situation.

23. Defendant intended for Sylvia—a harmless and peaceful woman in her seventies, who presented no threat to anyone and was no risk of flight—to spend the day in jail. That's why it obtained a warrant, instead of a summons, and also bypassed the Bexar County district attorney's office—the default practice for those accused of nonviolent crimes, which would have afforded Sylvia an opportunity to be processed through a satellite booking, rather than going to jail. As it happens, the district attorney's office, upon later review, dismissed the charges against Sylvia.

***Castle Hills.***

24. Defendant Castle Hills is a city with fewer than 5,000 residents.

25. The mayor of Castle Hills is an elected position. The mayor serves as the presiding officer of the city council. The mayor casts a tie-breaking vote on the city council and has the power to call special council meetings.

26. The Castle Hills city council is the five-member executive body of the City. The members are elected for two-year terms. They vote to set policy, adopt the City's budget, approve purchases and contracts, and review laws. They also appoint executive officials, such as the city manager and city attorney.

***Sylvia Runs for Office.***

27. When Sylvia decided to run for office, she was prepared for a grueling campaign to unseat her opponent, who was a well-connected incumbent supported by the City.

28. Sylvia campaigned house-to-house, knocking on countless doors and personally meeting with more than 500 Castle Hills families.

29. Sylvia was not prepared, however, for the degree of negative feedback she would receive about the City during her campaigning.

30. Castle Hills residents complained to Sylvia about corruption and other problems with the City.

31. Although she did not know him personally, Sylvia was deeply disturbed by stories about city manager Ryan Rapelye.

32. As one example, Sylvia heard that Rapelye had falsely accused his secretary of stealing city documents, having her detained by Castle Hills police, and forcing her to take a lie detector test before firing her.

33. While campaigning, Sylvia also heard allegations that the City was steering city policy and resources away from resident services and toward enriching city employees.

34. Beyond the stories, many residents conveyed frustration with Castle Hills government and with city manager Rapelye. One resident suggested Sylvia organize a petition to express discontent with Rapelye's performance.

***Sylvia Wins the Election.***

35. On May 4, 2019, Sylvia was elected as the first Hispanic councilwoman in Castle Hills history.

36. On May 14, 2019, Sylvia was sworn in as a member of the council by Bexar County sheriff Javier Salazar.

***Sylvia Takes Office and Takes on the City.***

37. As her first act in office, Sylvia participated in organizing a citizen-signed, nonbinding petition calling for the removal of city manager Rapelye from office.

38. The petition was a pure expression of political speech. It had no legal force. It was designed to simply express the discontent of Sylvia's constituents with Rapelye's performance as city manager and was signed by more than 300 Castle Hills residents.

39. The petition had six concise bullet points and was titled "FIX OUR STREETS Reinstate former City Manager Diane Pfeil." *Id*.

40. The petition proposed that city council replace Rapelye with Diane Pfeil, a previous city manager who had been removed from office after disputes with other city officials. *Id*.

41. In addition, one of the bullet points in the petition criticized "various city managers" who came after Diane Pfeil for "ma[king] up priority lists and pa[ying] for expensive engineering studies." "None," the petition continued, "have fixed a single street." *Id*. Rapelye is one of the various city managers who came after Diane Pfeil.

42. Defendants mistakenly believed that Sylvia collected all of the 300-plus signatures, even though she personally obtained just a fraction of this total number.

43. Not everyone who heard from Sylvia signed her petition. Chalene Martinez, a resident with connections to the City, declined to sign.

44. On May 21, 2019—Sylvia's first council meeting—a resident submitted the petition to the city council

45. To Sylvia's surprise, the City expected its submission.

46. Due to its contentiousness, the meeting was ultimately carried over to the next day, May 22, 2019.

47. The May 22 meeting remained tense, while the city council argued over city manager Rapelye's job performance.

48. Importantly, Sylvia and the mayor sat next to each other at the council table during council meetings.

49. When the meeting was finally over, Sylvia got ready to go, picking up all of the hand-outs on her side of the dais and placing them in her binder.

50. During this entire conversation, Sylvia was standing with her back to the dais.

51. At some point during the conversation, a police officer tapped on Sylvia's shoulder and told her that the mayor wanted to talk to her.

52. Sylvia turned around and, escorted by the officer (which she found rather strange), went back to the dais, where the mayor and she had been sitting next to each other during the meeting.

53. With the officer by his side, the mayor asked Sylvia: "Where's the petition?"

54. Sylvia replied: "Don't you have it? It was turned in to you yesterday."

55. Responding in the negative, the mayor then asked Sylvia to look for the petition in her binder.

56. Sylvia did and, much to her surprise, found the petition there.

57. When Sylvia handed the petition to the mayor, he stated: "You probably picked it up by mistake."

58. The two parted ways, with Sylvia not thinking much of the encounter.

59. Sylvia did not intentionally put the petition in her binder.

60. Sylvia never left the council room with the petition. Indeed, she never even left the council table with the petition.

61. Sylvia had worked hard to help organize the petition and ensure its submission to city council. The petition gave more force to Sylvia's own judgment that the city manager was not doing a good job. It would have been entirely illogical for Sylvia to try to take back the petition.

*Castle Hills Retaliates Against Sylvia, Ultimately Securing Her Arrest.*

62. The City and its officials, acting under color of Texas law and cloaked in authority from Castle Hills, then developed a comprehensive plan to punish and deter Sylvia based on her political expression. The plan was to give Sylvia a taste of her own medicine by removing her from the city council.

63. The City was motivated to punish Sylvia for her speech—and deter future speech—based on the content of that speech.

64. Had the City not harbored retaliatory animus toward Sylvia's speech, they would have never acted on any one of the three options in their plan.

**Option 1: Charge Sylvia with a crime and arrest her.**

65. As described in councilmember McCormick's article, the surest way to remove a council member is by obtaining a criminal conviction against her.

66. To punish Sylvia for championing the petition and to deter her from the future exercise of her First Amendment rights, the City developed and executed a plan to manufacture criminal charges against Sylvia and have her thrown in jail.

67. On May 24, 2019—two days after city officials confronted Sylvia about purportedly stealing the petition that she supported—the police chief told another police officer that the mayor would be contacting the officer "in reference to the filing of a criminal complaint" against Sylvia, which happened.

68. After the complaint was filed, an officer began his investigation by going to the homes of people who signed the petition and questioning them about this act of civil expression.

69. Many of these individuals whom the officer approached said they felt threatened by his actions and questions, as it was difficult to understand why a police officer would be knocking on their doors and challenging their signatures on a nonbinding petition, with no force other than an expression of political thought.

70. On June 18, 2019—with the investigation going nowhere—the City changed strategy and appointed a special detective.

71. Following an investigation, the only charge the Defendant could come up with was a Class A misdemeanor for tampering with a government record, for supposedly attempting to steal a petition that Sylvia herself championed. Tex. Penal Code § 37.10(a)(3), (c)(1).

72. The City made the most of this charge, however, by doing three distinct things to ensure that Sylvia would be jailed based on it, rather than simply asked to appear before a judge.

73. First, the City chose to obtain a warrant, rather than a summons—the procedure normally reserved for people suspected of nonviolent crime. Unlike warrants, summonses do not require a trip to jail.

74. Second, the City didn't just obtain a warrant through normal channels, by going through the district attorney (the "DA"). Instead, they circumvented the DA by using a procedure typically reserved for violent felonies or emergency situations and walked the warrant directly to a magistrate. When the DA's office finally learned of the charges and reviewed them, it dismissed them.

75. Third, by using the procedure that circumvented the DA, the City also ensured that Sylvia would not be able to avoid jail by taking advantage of the satellite booking function provided by the Bexar County jail system to weed out nonviolent offenses. This function allows individuals with outstanding warrants to be booked, processed, and released without being jailed.

Because Sylvia's warrant was not acquired through the traditional channels, it was not discoverable through the satellite office's computer system, leaving Sylvia no option other than jail.

76. It was bad enough that Sylvia was jailed for a nonviolent offense. Even worse, the charge itself was a sham, since the statute it utilized was never before used to charge people on facts even remotely similar to Sylvia's.

77. According to the affidavit, Sylvia violated the misdemeanor statute because she tried to steal the petition she herself championed. As evidence of the attempt, the affidavit used the brief, inconclusive statements made by Chalene Martinez during the meeting on May 21, as well as the allegations made by the mayor in his complaint. The affidavit also accused Sylvia of being openly antagonistic toward city manager Rapelye. The affidavit did not dispute that Sylvia was expressing political speech. The issue was that this speech was intended to oust defendant Rapelye from his job. Indeed, the affidavit shows that Sylvia's speech was the motivation behind the City's investigation:

  a. "From her very first [council] meeting in May of 2019, [Sylvia] (along with another alderwoman) has been openly antagonistic to the city manager, Ryan Rapelye, wanting desperately to get him fired."

  b. "Part of her plan to oust Mr. Rapelye involved collecting signatures on several petitions to that effect."

  c. "Gonzalez had personally gone to [a resident's] house on May 13, 2019, to get her signature on one of the petitions under false pretenses, by misleading her, and by telling her several fabrications regarding Ryan Rapelye . . . ."

10

78. Importantly, there was no need to examine Sylvia's speech in order to determine whether there was probable cause to arrest her for theft.

79. Furthermore, a review of misdemeanor and felony data from Bexar County over the past decade makes it clear that the misdemeanor tampering statute has never been used in Bexar County to criminally charge someone for trying to steal a nonbinding *or* expressive document.

80. Of 215 grand jury felony indictments obtained under the tampering statute at issue in this case, not one had an allegation even closely resembling the one mounted against Sylvia. By far the largest chunk of the indictments involved accusations of either using or making fake government identification documents: altered driver's licenses, another person's ID, temporary identification cards, public safety permits, green cards, or social security numbers. A few others concerned the misuse of financial information, like writing of fake checks or stealing banking information. The rest are outliers, but all very different from Sylvia's situation. They concern hiding evidence of murder, cheating on a government-issued exam, and using a fake certificate of title, among others.

81. Misdemeanor data is even more unremarkable. In each case available for review, the alleged tampering involved the use of fake social security numbers, driver's licenses, and green cards.

82. The data, as well as the availability of procedures designed to allow people suspected of nonviolent offenses avoid going to jail, are clear: Defendant only had Sylvia arrested because they were harboring retaliatory animus toward her and wanted to punish her for speaking out against city manager Rapelye and the entrenched interests of the City he represented.

83. Had the City lacked retaliatory animus, the it would not have devised, adopted, or implemented their plan, which resulted in Sylvia's arrest.

84. Sylvia learned about a warrant for her arrest when she was in a doctor's office, waiting for her appointment.

85. As the receptionist called her name, a neighbor called Sylvia on her cellphone and told her that she should turn herself in.

86. Explaining to the receptionist that she had an emergency and had to leave, Sylvia went downstairs and waited for her husband to pick her up.

87. The two septuagenarians then drove to the county jail.

88. The 72-year-old councilwoman was booked on July 18, 2019, spending a terrifying day in jail, sitting, handcuffed, on a cold metal bench, wearing an orange jail shirt, and avoiding using the restroom, which had no doors and no toilet-paper holders. The entire time there, she was not allowed to stand up and stretch her legs.

89. For someone who doesn't even have a speeding ticket on her record, this was quite an experience.

90. Sylvia's name and mugshot were splashed across local media for days, and they are still on the internet.

**Option 2: Remove Sylvia from office for a made-up technicality.**

91. The City was considering alternative options to retaliate against Sylvia for her political speech. After all, their ultimate retaliatory goal was to intimidate, punish, and silence Sylvia by removing her from office. One way of achieving it was by arresting her and throwing her in jail. Another was by trying to remove Sylvia directly.

92. Remarkably, the city attorney—present at council meetings to ensure that necessary legal requirements are followed—had attended Sylvia's swearing-in by sheriff Salazar and raised

no concerns at the time. Instead, he watched approvingly from mere feet away as Sylvia took her oath of office, applauding when she concluded.

93. But now, motivated by retaliatory animus toward Sylvia, the City declared that Sylvia had been improperly sworn in and was not qualified to remain in her seat on the council. Further, because more than 30 days had elapsed since Sylvia's election, the City stated that Sylvia could not be resworn. Instead, she had to be replaced by Amy McLin, whom Sylvia had beaten in the election.

94. When the issue was raised at a council meeting, the city attorney said it was not properly before the council and could not be taken up. Evidencing the retaliatory purpose of Sylvia's removal, the City had not attempted to take similar actions against council members who had been sworn in by sheriffs in the past, including two who were sworn in by a sheriff in 2014 and served out their terms without incident.

95. Determined to address the concern and move on, Sylvia got resworn by a notary at a bank. She and her friend then went to the city manager's office to turn in the certificate, proving that she did so. As she was walking out the door, Sylvia overheard city manager Rapelye complain to someone: "You know what she did? She campaigned against me!"

96. Sylvia also contested Defendant's decision to order her removal by securing a special council meeting to take up the issue on July 17, 2019. That's when the City knew that the simple route of direct removal was not going to be so simple.

97. After she was released from jail on bond, Sylvia sought a temporary restraining order against Castle Hills enjoining her removal. A court granted the order the day after her filing, on July 23, 2019.

**Injury to Plaintiff**

*Defendants Have Severely Harmed Sylvia.*

98. The retaliatory arrest manufactured by the City directly and proximately caused severe harms to Sylvia, including but not limited to:

   a. The harm to Sylvia's reputation. Sylvia's mugshot was displayed repeatedly in the media, both in her community and beyond. She was the subject of repeated news articles about her wrongful arrest. To this day, harmful and embarrassing news articles with Sylvia's mugshot appear when one searches for her on the internet. This harm continues to this day and is likely to continue in the future.

   b. The harm to her future opportunities. Sylvia's arrest is a matter of public record. If she were to ever apply for a job (which is increasingly likely even for senior citizens, in times of economic uncertainly) or for public benefits, her chances of succeeding would be significantly diminished due to her criminal record. *See* Elisha Jain, *Arrests as Regulation,* 67 Stan. L. Rev. 809, 810 (2015); *see also* Gary Fields & John R. Emshwiller, Opinion, *As Arrest Records Rise, Americans Find Consequences Can Last a Lifetime,* Wall St. J. (Aug. 18, 2014), https://www.wsj.com/articles/as-arrest-records-rise-americans-find-consequences-can-last-a-lifetime-1408415402?st=cj2xuywlkthsmji.

   c. The harm to her pocketbook. Sylvia had to pay a fee to be released from jail, a bondsman to secure her bond, and tens of thousands of dollars to lawyers to defend against the criminal charges.

   d. The harm to her faith in the criminal justice system. Defendants' actions caused Sylvia to lose faith in the criminal justice system and law enforcement in Castle

              Hills, a place where she lives and where her family has worked in law enforcement.

    e.    The harm to her physical health. Stress brought on by the worry about her criminal prosecution led to many sleepless nights as well as anxiety-filled days, resulting in the overall deterioration of Sylvia's physical health.

**Causes of Action**

**Count I**
**42 U.S.C. § 1983 – First and Fourteenth Amendments**
**(Retaliatory Arrest Claim against the City of Castle Hills)**

99.    Sylvia realleges and incorporates by reference the allegations in Paragraphs 1 through 98 of this complaint, as if fully stated herein.

100.    Through its policy makers and high level officials Castle Hills adopted and enforced an official policy or custom to retaliate against Sylvia for her First Amendment activities, namely the expression of her political thought through a nonbinding citizens' petition urging the firing of city manager Rapelye.

101.    As noted in Count I and elsewhere in the complaint, the City retaliated against Sylvia in violation of the First Amendment by concocting a scheme to arrest Sylvia on manufactured misdemeanor charges.

102.    This scheme was a part of an official policy or custom that was deliberate, long-term, and pervasive, unlike on-the-spot decisions to arrest, sometimes made by individual officers in split-second situations.

103.    The decision to arrest Sylvia can also be easily disentangled from her speech: unlike in some situations where an officer has to take speech into account when determining whether an arrest is warranted (for example content of speech could indicate whether a suspect is ready to

cooperate or presents a continuing threat), here, there was no need to consider the substance of the petition to determine whether the tampering statute was violated. Afterall, the basis for Sylvia's arrest was the allegation that she tried to steal her petition. The substance of the petition has nothing to do with evaluating whether the theft took place.

104. The actions taken by policy makers detailed throughout this complaint are attributable to the city. As final policy makers with final authority, or who were delegated final authority, these individuals made a deliberate choice to adopt a course of action that retaliated against Sylvia and resulted in her arrest. They also ratified these retaliatory acts.

105. The actions undertaken or ratified by the City constitute the moving force behind the retaliatory arrest aimed at Sylvia's exercise of her First Amendment rights, which caused harm to Sylvia, including, but not limited to damage to her reputation, her health, her financial circumstances, and other adverse effects.

106. Had it not been for the retaliatory animus, the City would have never caused, permitted, or approved Sylvia's arrest for championing a nonbinding citizens' petition that did nothing other than express public discontent with the city government.

107. Alternatively, in recent years, there has been a persistent and widespread practice by Castle Hills of retaliating against city residents who voice criticism of the City or its officials or who petition the City for redress of grievances.

108. In addition to what happened to Sylvia, Castle Hills has a history of cracking down on disfavored speech.

109. For example, in 2017 or 2018, a local resident organized a petition to advocate for the closing of an impound lot in his neighborhood. To intimidate the resident and discourage him

from submitting the petition then-current officials including the former police chief, the former mayor, and the former city manager showed up at the resident's home and threatened him.

110. Similarly, in 2018, when another city resident put up opposition campaign signs on private front yards with owner permission, then-current officials called and threatened him with an easement violation. "If this is the way y'all want to play the game," one official said in a voicemail message, "then I can order the police to just go ahead and write citations to everybody that has them in the easement and kinda, maybe report it that you were the one that started this."

111. In 2016 and 2018, some current officials were still in positions of power in Castle Hills. As such, they—as current policymakers—had actual or constructive knowledge of this unconstitutional policy or custom of retaliating against city residents who criticize Castle Hills or its officials or who petition the City for redress of grievances.

112. But for the City's policy or custom of retaliation in response to criticism of those in power, Sylvia would not have been arrested, had her reputation dragged through the mud, subjected to abuse of process, and suffered various other harms that further serve to chill her First Amendment activities.

## Prayer for Relief

**WHEREFORE**, Sylvia Gonzalez seeks a judgment (1) declaring that the City violated her rights under the First and Fourteenth Amendments to the United States Constitution, and (2) awarding her personal injury money damages against the City of Castle Hills, Texas. Sylvia also seeks her attorney's fees and costs under 42 U.S.C. § 1988 as well as all other and further relief as the Court may deem just and proper.

## **Jury Demand**

Sylvia Gonzalez demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ Anya Bidwell
Anya Bidwell (TX Bar No. 24101516)
Will Aronin*
Patrick Jaicomo*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
abidwell@ij.org
waronin@ij.org
pjaicomo@ij.org

* Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that, on this ___15th___ day of October 2025, I electronically filed the Amended Complaint with the Clerk of Court using the CM/ECF system.

/s/ Anya Bidwell